## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MATTHEW FRIEDSON,

     Plaintiff,

v.                                    Case No. 3:19-cv-237-J-32PDB

SHERIFF DAVID SHOAR and
DEPUTY RYAN WALLACE,

     Defendants.

_____

# O R D E R

This case is before the Court on Defendant Deputy Ryan Wallace's Motion for Summary Judgment, (Doc. 25), and Defendant Sheriff David Shoar's Motion for Summary Judgment, (Doc. 26). Plaintiff Matthew Friedson filed a consolidated response in opposition. (Doc. 29).[1] The Court heard oral argument on June 29, 2020, the record of which is incorporated by reference.

## I. BACKGROUND

On February 27, 2015, Friedson, who is deaf, was driving to meet his daughter and ex-wife for bagels. (Doc. 25-1 at 5:1, 22:18–20, 26:22–24). Initially,

---

[1] Also pending is the Sheriff's Motion to Dismiss (Doc. 23). However, as the Court is granting the Sheriff's motion for summary judgment, his Motion to Dismiss is moot.

he did not realize he was behind Wallace's marked patrol vehicle because he "had been looking for some papers . . . and the radio was playing . . . ." <u>Id.</u> at 31:3–5, 32:9–15. Friedson realized he needed to go a different direction, so he pulled into the right lane and passed Wallace. <u>Id.</u> at 32:1–6. As he was passing Wallace, Friedson gave himself the middle finger, to say "'Darn it,' you know, 'I went the wrong way.'" <u>Id.</u> at 33:9–10. According to Friedson, deaf people will sign to themselves in the same manner that hearing people talk to themselves. <u>Id.</u> at 34:2–17. Wallace then got behind Friedson and pulled him over, <u>id.</u> at 36:7–17, for following too closely, (Doc. 25-2 ¶ 4).

According to Friedson, Wallace approached Friedson's car with his gun drawn. (Doc. 25-1 at 39:8). At first, Wallace was talking on his radio behind Friedson and did not know Friedson was deaf. <u>Id.</u> at 39:4–7. Friedson knew that Wallace was telling him to open his door or window, <u>id.</u> at 39:22–40:2, but Friedson refused to comply, <u>id.</u> at 40:23–24. Friedson gestured to Wallace that he was deaf by putting "an open five hand against [his] ear and had [his] hands up . . . ." <u>Id.</u> at 40:14–15. Wallace again attempted to open the door and have Friedson put down the window, but he was unsuccessful. <u>Id.</u> at 40:16–19. Although Friedson has the ability to speak, he chooses not to and did not attempt to speak to Wallace. <u>Id.</u> at 16:13–17:6, 40:25–41:7. Friedson attempted to gesture that he and Wallace should write back and forth, "[a]nd [Friedson] was just trying to get [Wallace] to understand that [Friedson] was deaf . . . ."

2

Id. at 41:7–12. Friedson did not attempt to use any other form of communication, such as his cell phone, a notepad, etc., to communicate with Wallace. Id. at 42:22–43:7.

Friedson contends that he gestured for Wallace to follow him to the nearby parking lot where his ex-wife and daughter were waiting. Id. at 47:6–9. At the second stop, Friedson handed Wallace his license and Wallace took it back to his patrol vehicle. (Doc. 25-1 at 49:22–23). Then Friedson got back out of his car to give his attorney's business card to Wallace, id. at 49:23–25, but Wallace gestured for Friedson to get back in his car and Friedson complied. Id. at 50:1–2. Wallace then went back to Friedson's car, told Friedson to get out, and Wallace tripped Friedson, cuffed him, and put him in the back of his patrol car. Id. at 51:14–16, 63:18–19.

At that point, another deputy arrived and had Friedson's daughter translate for Friedson so he could tell the new deputy what had transpired. Id. at 64:11–23. Friedson was issued a ticket for following too closely and paid the fine. Id. at 67:19–24. Throughout the entire situation, Friedson never asked for an interpreter. Id. 67:18–20. Of the three or four times Friedson has been arrested, he has never had a deputy trained in sign language. Id. at 74:6–11.

After the Court dismissed in part Friedson's original complaint, he filed an Amended Complaint, alleging: a false arrest claim under 42 U.S.C. § 1983 against Wallace (Count I), violation of the Americans with Disabilities Act

("ADA") against the Sheriff (Count II), violation of the Rehabilitation Act ("RA") against the Sheriff (Count III), state law false arrest against Wallace (Count V), and state law false arrest against the Sheriff (Count VI).[2] (Doc. 21). Both Wallace and the Sheriff have filed motions for summary judgment. (Docs. 25, 26).

## II. STANDARD OF REVIEW

Where there is no genuine dispute of any material fact, a district court "shall" grant summary judgment. Fed. R. Civ. P. 56(a). Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). As Friedson is the non-movant, the facts are construed in the light most favorable to him, and, as recounted above, are primarily his version of the events from his deposition. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (holding that the evidence must be viewed in the light most favorable to the nonmoving party).

---

[2] Friedson's amended complaint does not have a Count IV.

## III. DISCUSSION

### A. Wallace's Motion for Summary Judgment

Friedson alleges two claims against Wallace: false arrest under 42 U.S.C. § 1983 and false arrest under Florida common law. For the federal claim, Wallace asserts he is entitled to qualified immunity because he had arguable probable cause to arrest Friedson. Under the state law claim, Wallace similarly contends that because he had probable cause to arrest Friedson, the claim must be dismissed.

Qualified immunity protects public officials from suit so long as their actions do not violate clearly established constitutional or statutory rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> Qualified immunity applies to police officers partly because the law recognizes that they do an important and necessary—but sometimes dangerous—job on the public's behalf. An officer's duties often require her to rely on imperfect information to make snap judgments that can sometimes be the difference between life and death. See, e.g., Graham v. Connor, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). But those snap judgments must be reasonable to fall within qualified immunity's ambit. See id. at 396, 109 S. Ct. 1865; see also Saunders v. Duke, 766 F.3d 1262, 1266 (11th Cir. 2014). So when we consider whether an officer is entitled to qualified immunity, we balance "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [them] from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Patel v. City of Madison, 959 F.3d 1330, 1337–38 (11th Cir. 2020) (alterations in original).

"An arrest made without probable cause is an unreasonable seizure," Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019), and unreasonable seizures violate the Fourth Amendment,[3] U.S. Const. amend. IV. "Simply stated, [the probable cause] standard requires that an arrest be objectively reasonable under the totality of the circumstances." Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1119 (11th Cir. 1992). "This standard is met 'when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" Alston v. Swarbrick, 954 F.3d 1312, 1318 (11th Cir. 2020) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007)). "[W]hat counts for qualified immunity purposes relating to

---

[3] The Court is skeptical that Friedson was arrested, as opposed to merely detained. Wallace states in his affidavit that he detained Friedson for his safety. However, Friedson's amended complaint alleges false arrest and Wallace's motion for summary judgment only argues that he had probable cause to arrest. The distinction is important because for a temporary detention, an officer need only show a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity, Terry v. Ohio, 392 U.S. 1, 21 (1968), which "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ." United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (quotation marks omitted) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). However, the Court need not determine whether Wallace's actions were an arrest or a temporary detention because even taking the evidence in the light most favorable to Friedson, Wallace had probable cause to arrest Friedson.

probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999). The standard for probable cause is the same under Florida and federal law. Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).

Wallace avers that Friedson followed his marked patrol vehicle too closely in violation of Florida statute § 316.0895. (Doc. 25-2 ¶ 4); § 316.0895(1), Fla. Stat. (2019) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon, and the condition of, the highway."). Friedson testified that he didn't realize he was behind a marked patrol car because he was looking for papers and the radio was playing. (Doc. 25-1 at 32:9–32:15). Although Friedson felt that the space between his car and Deputy Wallace's car was a regular following distance, id. at 32:16–32:20, Friedson paid the fine for following too closely and did not contest it, id. at 67:22–68:5.

Under Florida law, a law enforcement officer may arrest an individual without a warrant when "[a] violation of chapter 316 has been committed in the presence of the officer. Such an arrest may be made immediately or in fresh pursuit." § 901.15(5), Fla. Stat. (2019). If an officer does so, he does not violate the Fourth Amendment. See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has

committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); <u>Reid v. Henry Cty.</u>, 568 F. App'x 745, 748–49 (11th Cir. 2014) ("The existence of a traffic violation can provide an officer with arguable probable cause to make an arrest, even though the offense is minor or normally punishable by a monetary citation, and even if the officer had no knowledge of that violation at the time."). Contrary to Friedson's argument at the hearing, it makes no difference if the traffic violation is considered a noncriminal traffic violation. See <u>Durruthy v. Pastor</u>, 351 F.3d 1080, 1089 (11th Cir. 2003) (finding that defendant-officer was entitled to qualified immunity because she had probable cause to arrest plaintiff for violating Florida statute § 316.130, a non-criminal violation); <u>see also, e.g.,</u> <u>United States v. Burrows</u>, 566 F. App'x 889, 892 (11th Cir. 2014) (holding that officers could legally detain the plaintiff where he stopped in the middle of a crosswalk in violation of a Florida traffic law); <u>Jeanty v. City of Miami</u>, 876 F. Supp. 2d 1334, 1344 (S.D. Fla. 2012) ("Regardless of whether probable cause existed to arrest Jeanty for the stated offense of driving with an expired registration, probable cause did exist to arrest Jeanty for parking in a crosswalk, parking within twenty feet of a crosswalk at an intersection,  or parking within thirty feet of a stop sign." (citations omitted)). Therefore, Wallace did not violate the Constitution when he arrested Friedson.

8

The parties spent most of their energy on whether Wallace had probable cause to arrest Friedson for obstructing an officer without violence under Florida Statute § 843.02. But Wallace evinced no intent at the time to base his detention of Friedson on a violation of § 843.02. And, because Wallace indisputably had probable cause to arrest Friedson for the traffic violation, the Court need not address whether Wallace could have arrested Friedson for obstructing an officer.

Because Wallace had probable cause to arrest Friedson for his traffic violation, he is entitled to summary judgment on Friedson's federal and state false arrest claims.[4]

**B. Shoar's Motion for Summary Judgment**

Friedson brings three claims against the Sheriff: violation of the ADA, violation of the RA, and state law false arrest claim. As Wallace had probable cause to arrest Friedson, the false arrest claim against the Sheriff also fails. See Davis v. City of Apopka, 734 F. App'x 616, 621 (11th Cir. 2018) (stating that actual probable cause is a complete bar to a Florida false arrest claim against municipality). Thus, the Court turns to Friedson's ADA and RA claims.[5]

---

[4] In reaching this conclusion, the Court is not addressing whether Wallace exercised sound law enforcement judgment in his handling of the situation.

[5] "With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." Badillo v. Thorpe, 158 F. App'x 208, 214 (11th

## 1. The Sheriff did not violate the ADA or RA.

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1)–(2). To state a Title II claim under the ADA, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).[6]

Police conduct during an arrest of a disabled person is within the parameters of the ADA so long as the plaintiff was "subjected to discrimination." Bircoll v. Miami–Dade Cty., 480 F.3d 1072, 1084–85 (11th Cir. 2007). Under the ADA's implementing regulations, public entities shall furnish auxiliary aids,

---

Cir. 2005) (citing Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)).

[6] An ADA plaintiff may proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations. See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). Here, Friedson states his claim is for failure to make reasonable accommodations. (Doc. 29 at 11).

including qualified interpreters, where necessary to afford disabled persons equal opportunity. 28 C.F.R. § 35.160(b)(1). However, "[t]he ADA's 'reasonable modification' principle . . . does not require a public entity to employ any and all means to make auxiliary aids and services accessible to persons with disabilities, but only to make 'reasonable modifications' that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." Bircoll, 480 F.3d at 1082 (quoting Tennessee v. Lane, 541 U.S. 509, 531–32 (2004)). Therefore, the "question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety." Id. at 1085. In Title II cases, the reasonable modification inquiry is highly fact-specific. The Eleventh Circuit notes that "terms like reasonable are relative to the particular circumstances of the case . . . [and] must be decided case-by-case . . . ." Id.

Normally, ADA and RA violations only entitle a plaintiff to injunctive relief. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1134 (11th Cir. 2019). "To get damages—as [Friedson] seeks here—a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" Id. (quoting Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 348 (11th Cir.

2012)). To show deliberate indifference, a plaintiff must prove that "the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." <u>Id.</u> (alteration adopted) (quotation marks omitted) (quoting <u>Liese</u>, 701 F.3d at 344). Where the defendant is a municipal entity—as the Sheriff is here—"the plaintiff must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf' had 'actual knowledge of discrimination in the entity's programs and failed adequately to respond.'" <u>Id.</u> (alterations adopted) (quoting <u>Liese</u>, 701 F.3d at 349).

Friedson's ADA and RA claims seek only damages. <u>See</u> Doc. 21. Therefore, Friedson must demonstrate that the Sheriff—the only defendant named in the ADA and RA claims—"had actual knowledge of discrimination in the entity's programs and failed adequately to respond." <u>Id.</u> (citations and quotation marks omitted). Despite asserting his ADA and RA claims against only the Sheriff, Friedson's entire response focuses on Wallace's actions. (Doc. 29). But nothing in the record demonstrates that under the ADA or RA Wallace qualifies as an "official," <u>i.e.</u>, "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." <u>Liese</u>, 701 F.3d at 350. And, nothing in the record

12

demonstrates that the Sheriff had "actual knowledge of discrimination," never mind "fail[ing] to adequately respond." Silberman, 927 F.3d at 1134. In fact, the Sheriff attached his policy on communicating with deaf individuals to his motion (without discussing it); it prohibits employees from discriminating against individuals based upon their disability. (Doc. 26-1 ¶ 4). Thus, there is not even an inference that the Sheriff had knowledge of prior acts of discrimination; instead, he had policies in place prohibiting it.[7]

The Court has also considered whether Friedson's ADA and RA claims against the Sheriff could be premised on vicarious liability. Whether a Title II ADA or RA claim can proceed based on vicarious liability remains an open question in the Eleventh Circuit. Silberman, 927 F.3d at 1134 n.6 ("[T]he availability of respondeat superior for Title II and the § 504 claims remains an open question.");[8] see also Welch v. City of Hartselle, 423 F. Supp. 3d 1277,

---

[7] There is also no record evidence that there was a "custom" or "practice" of discrimination of which the Sheriff was aware.

[8] Although declining to decide the issue, the Eleventh Circuit stated:

On the one hand, in T.W. [v. Sch. Bd. of Seminole Cty., 610 F.3d 588, 604 (11th Cir. 2010)] we pointed to our decision in Mason v. Stallings, 82 F.3d 1007 (11th Cir. 1996), as authorizing vicarious liability under Title I of the ADA—the employment chapter. On the other hand, there may be reason to think that Mason's logic doesn't extend to Title II and § 504, given that the Supreme Court rejected respondeat superior liability under Title IX in Gebser [v. Lago Vista Ind. Sch. Dist., 524 U.S. 274 (1998)]—the case from which we derived the Liese [701 F.3d 334] standard.

Silberman, 927 F.3d at 1134 n.6.

13

1283 (N.D. Ala. 2019) (declining to apply respondeat superior to a deaf man's ADA and RA claims against the city for his arrest). Here, the Court need not resolve whether vicarious liability against the Sheriff is available; even if authorized, Friedson's claims fail because no reasonable jury could conclude that Wallace was deliberately indifferent to Friedson's rights under the ADA and RA.

The deliberate indifference standard is "exacting," and requires a showing that is more than gross negligence. McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1147 (11th Cir. 2014). Failure to provide an interpreter is not enough to find deliberate indifference. Id. Instead, Friedson "must show that [Wallace] knew there was a substantial likelihood that [Wallace] would be unable to communicate effectively with [Friedson] absent an interpreter but still made a 'deliberate choice' not to provide one." Id. at 1147–48.

By all accounts, the first traffic stop was chaotic. See Docs. 25-1, 25-2; see also Bircoll, 480 F.3d at 1082 (taking into account criminal activity and safety concerns in determining whether any modification of police procedures is reasonable). Initially, Wallace did not know Friedson was deaf. (Doc. 25-1 at 39:4–7). Nonetheless, Friedson acknowledges that he understood Wallace's commands to roll down the window and open the door. Id. at 39:22–40:2. And at the second traffic stop, Friedson complied with Wallace's commands to produce his license, id. at 49:22–23, and return to his vehicle, id. at 50:1–2.

14

Wallace and Friedson were communicating well enough to render further modifications to normal police procedures unnecessary. See Bircoll, 480 F.3d at 1082. Simply stated, because Wallace was able to communicate with Friedson—though not perfectly—there is an absence of evidence demonstrating Wallace made the "deliberate choice" to violate Friedson's ADA and RA rights.[9]  See McCullum, 768 F.3d at 1147–48; Bircoll, 480 F.3d at 1082.

The Court realizes the challenges that Friedson faces in encounters such as he had with Deputy Wallace.   But on this record, no reasonable jury could find that Wallace acted with deliberate indifference to Friedson's ADA or RA rights; therefore, the Sheriff is not vicariously liable for Wallace's actions and is entitled to summary judgment on Friedson's ADA and RA claims.[10]

Accordingly, it is hereby

**ORDERED:**

1.    Defendant Deputy Ryan Wallace's Motion for Summary Judgment, (Doc. 25), is **GRANTED**.

---

[9] At oral argument, Friedson's counsel conceded that Wallace was not required to bring an interpreter to the scene but argued he should have communicated with Friedson in writing.

[10] Because Friedson does not seek injunctive relief, the Court does not need to determine whether Wallace's actions denied Friedson the full benefits of the Sheriff's services, or whether such a claim is even actionable under the ADA or RA absent discriminatory intent. Bircoll, 480 F.3d at 1082.

2.     Defendant Sheriff David Shoar's Motion for Summary Judgment, (Doc. 26), is **GRANTED**.

3.     Defendant Sheriff David Shoar's Motion to Dismiss, (Doc. 23), is **DENIED as moot**.

4.     The Clerk shall enter judgment in favor of Defendants Sheriff David Shoar and Deputy Ryan Wallace and against Plaintiff Matthew Friedson; thereafter, the Clerk shall close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 18th day of August, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

jjb
Copies to:

Counsel of record

16